**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 CR 33-1** |
| **vs.** | ) | |
| | ) | **Hon. Thomas M. Durkin,** |
| **SETH GILLMAN, et al.,** | ) | **Presiding Judge** |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING POSITION PAPER**

Now comes the defendant, Seth Gillman, by and through his undersigned attorneys, and respectfully requests that this Honorable Court, in light of *Gall v. United States*, 552 U.S. 38 (2007) and the factors set forth in 18 U.S.C. § 3553(a), sentence him to the shortest term of imprisonment permissible under the law. In support, the following is offered:

## INTRODUCTION

It has been over five years since federal agents swarmed Passages Hospice's headquarters in Lisle, Illinois. Since then, Seth Gillman's life has been consumed with anxiety, humiliation, and anguish as he has waited for his time before this Honorable Court for judgment. Gillman now comes before this Court extraordinarily humble and contrite. He is deeply ashamed and angered with himself for succumbing to criminal conduct. With exception to certain decisions and transgressions that have landed him before this Court, Gillman has committed his

life to helping his family, friends, and others in need, illustrating his genuine sense of compassion and generosity.

There is no denying the seriousness of the offense of conviction, and Gillman does not intend on doing so – he was clearly wrong. Instead, he offers himself to the mercy of this Court, to take into consideration not only those actions that brought him before this Court, but to take into consideration the full value of a man's life that was more often than not guided by principles of generosity and benevolence, when fashioning its sentence. Ultimately, Gillman respectfully requests this Court sentence him to the most lenient sentence permissible under the law; one that will be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## I. OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Upon entering a written plea agreement, Gillman reserved his right to dispute guideline enhancements the Government believed were applicable to this case. It was Gillman's position that several of the enhancements outlined in the written agreement were either inaccurate or inapplicable to the present offense conduct. Specifically, Gillman disagreed with the applicable loss amount, § 2B1.1(b)(1)(K), the federal health care offense enhancement, § 2B1.1(b)(7), and the abuse of trust enhancement, § 3B1.3. While the parties have come to an agreement as to the loss and restitution amount, there remains a disagreement as to the applicability of the other two enhancements.

## A. Applicable Loss And Restitution Amount

The parties have come to an agreement that the applicable loss and restitution amount for the instant offense is $9,000,000. This loss figure reflects a reasonable and conservative estimate of the loss that was caused by, or reasonably foreseeable to, Gillman. Because this agreed-upon loss figure is more than $3,500,000 but less than $9,500,000, the offense level is increased by 18 levels as opposed to the 20-level enhancement previously outlined in the written plea, the Government's version of the offense, and the Presentence Investigation Report ("PSR"). U.S.S.G. § 2B1.1(b)(1)(J).

Gillman acknowledges that he, together with any jointly liable co-defendants, is to make full restitution in an amount to be determined by the Court. The parties agree that the applicable restitution amount is at least $9,000,000, but less than $9,500,000. After law enforcement searched Passages' offices in January 2012, new measures were implemented to ensure that Passages followed Medicare requirements. *See* Gov. Ver., pp. 8-9. In the years that followed the search, Medicare withheld millions of dollars in reimbursements for claims submitted after 2012[1]. Gillman contends that the outstanding reimbursements being held by Medicare, the victim in this case, should be credited and applied towards the restitution amount. The Government has not indicated whether it will seek to challenge the validity of the unreimbursed claims.

---

[1] The Gillman's are in the process of gathering documentation in support of the total amount of reimbursements withheld and will provide a copy to the Court and the Government upon receipt.

[2] *See United States v. Novak, et al.*, 13 CR 312 (the district court determined that the abuse of trust and discretion enhancement was inapplicable to the

### B. Applicability of Federal Health Care Offense Enhancement Pursuant to U.S.S.G. § 2B1.1(b)(7)

The application of a three-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(7) is a violation of Gillman's due processes rights as guaranteed by the *Ex Post Facto* Clause. In finding that the entirety of the scheme is subject to subsection (b)(7) scrutiny, this Court would ignore principles of "fundamental justice", *Carmell v. Texas*, 529 U.S. 513, 531 (2000), by enhancing Gillman's sentence under Guidelines promulgated *after* he committed the majority of the offense in question. Gillman, however, is not completely immune from subsection (b)(7) enhancements. Because subsection (b)(7) was enacted prior to the completion of the charged scheme, any loss amount attributable to Gillman following the enactment of this subsection could potentially warrant an increase in the advisory guidelines – should there be enough pecuniary loss to trigger any part of the statute.

The *Ex Post Facto* Clause prohibits, *inter alia*, "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *United States v. Hurlburt*, 835 F.3d 715,722 (7th Cir. 2016) (internal citations omitted). As explained in *Peugh v. United States*, the *Ex Post Facto* Clause "ensures that individuals have fair warning of applicable laws and guards against vindictive legislative action." 133 S.Ct. 2072, 2085 (2013). One of the main purposes of the *Ex Post Facto* Clause is that "legislative enactments give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed[.]" *Miller v. Florida*, 482 U.S. 423, 429 (1987). To that end, the

*Ex Post Facto* Clause forbids the Government from "enhance[ing] the measure of punishment by altering the substantive 'formula' used to calculate the applicable sentencing range." *Peugh*, 133 S.Ct. at 2088 (citation omitted).

The majority of the alleged scheme was near its end by the time subsection (b)(7) of § 2B1.1 was put into effect. Specifically, the indictment alleged that Gillman participated in a scheme to defraud a health care benefit program beginning no later than August 2008 and continuing through January 2012. *See* Docket ("Dkt.") No. 25. Section 2B1.1(b), however, was first amended to include subdivision (7) on November 1, 2011 – three months prior to the end of the charged scheme. *See* U.S.S.G., *amend*. 749. The newly promulgated amendment reads:

> "(7) If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels; (ii) more than $7,000,000, increase by 3 levels; or (iii) more than $20,000,000, increase by 4 levels."

This amendment created a tiered-enhancement for offenders who defrauded the federal government of at least $1,000,000 by participating in a health care offense. Should this amendment have come into effect prior to 2008; there would be no issue as to its applicability in this matter. This amendment, however, had been in effect for under three months by the time the charged scheme had ended and, thus, cannot be applied to enhance Gillman's sentence unless the post-enactment monetary loss meets the threshold of subsection (7)(A).

Post-*Booker* federal sentencing Guidelines fall squarely within the protection of the *Ex Post Facto* Clause. The combination of formal legal requirements and real-

world effects have led the Supreme Court to conclude that, though advisory, Guidelines are not immune from *Ex Post Facto* Clause scrutiny. *Hurlburt*, 835 F.3d 723-34; *citing Peugh*, 133 S.Ct. at 2084. In fact, in *Peugh* the Court held that "[a] retrospective increase in the Guidelines range . . . creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation." *Id*. It is because of this that the Guidelines are "sufficiently law-like" and demand *ex post facto* protection in order to reflect the principles of "fundamental justice." See *Hurlburt*, 835 F.3d at 724 (internal citations omitted).

Subsection (b)(7) creates a significant risk of a higher sentence for Gillman. Although the Guidelines are advisory in nature, they do have a binding legal effect by providing a framework for sentencing. They enhance the measurement of punishment by providing this Court with an initial sentencing range that would factor in punishment for something that would otherwise have no effect on Gillman, had the scheme ended months earlier. While Gillman is not fully insulated from subsection (b)(7), as there was a pecuniary harm during the three months in which the statute was in effect, the Government must prove – by a preponderance of the evidence – that the amount of monetary loss during those months triggers any portion of subsection (b)(7). Without this, Gillman's sentence would run "contrary to the first principles of the social compact and to every principle of sound legislation." The Federalist No. 44, p. 282 (C. Rossiter ed. 1961) (J. Madison). As such, enhancing Gillman's sentence pursuant to a statute that was non-existent during almost the entirety of the charged offense would run contrary to these deep-rooted

principles of fairness in sentencing and should therefore not be applied against him.

### C. Applicability of Abuse of Trust Enhancement

It is inappropriate to enhance Gillman's Guidelines using the abuse of trust enhancement, § 3B1.3, because as an administrator of Passages, Gillman did not occupy a position of trust with the victim in this case, Medicare. An abuse of trust enhancement is only applicable if "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. A position of public or private trust is characterized by professional or managerial discretion in which the persons holding the positions are ordinarily subjected to less supervision than employees whose positions are primarily non-discretionary in nature. *See* U.S.S.G. § 3B1.3 cmt. n. 1. Moreover, the positions of public or private trust "must have contributed in some significant way to facilitating the commission or concealment of the offense." *Id.* The Government cannot satisfy either of these elements.

There is an element of misplaced trust inherent in every fraud. *United States v. Fuchs*, 635 F.3d 929, 935 (7th Cir. 2011) (internal citation omitted). Because of this, this Circuit has cautioned against using "bright-line rules" when applying the abuse of trust enhancement. *Id.*; *citing United States v. Andrews*, 484 F.3d 476, 479 (7th Cir. 2007). It is thereby required that a showing is made that "*the victim* placed more than the ordinary degree of reliance on the defendant's integrity and honesty." *Fuchs*, 635 F.3d at 935 (emphasis provided). Here, it is the Government's position that Gillman abused a position of trust because: (1) he, as an "authorized official",

made personal representations in provider enrollment forms that were necessary for billing Medicare; and, (2) he was an attorney, and represented himself as such when dealing with his employees. Both contentions fall short of triggering a § 3B1.3 enhancement.

First, Gillman did not occupy a position of trust merely because he signed multiple forms as an "authorized official" where he agreed to abide by certain rules and regulations put forth by Medicare. In support of its' position, the Government originally cited two cases in which medical providers were found to have abused a position of trust. *See* Government's Version of the Offense ("Gov. Ver."), p. 11. However, in both cases, the defendants were medical providers. See *United States v. Hoogenboom*, 209 F.3d 665 (7th Cir. 2000) (enhancement applied to a psychologist); *United States v. Vivit*, 214 F.3d 908, 914 (7th Cir. 2000) (enhancement applied to a medical doctor). Gillman, on the other hand, was a co-administrator of Passages and did not have a relationship with Medicare that fell within the confines of § 3B1.3. *United States v. Garrison*, 133 F.3d 831, 841-42 (11th Cir.1998).

In order for this enhancement to be applicable, the Government must establish a relationship that is more than "an ordinary, commercial relationship[.]" *Fuchs*, 635 F.3d at 934. Where, as here, "statutory reporting requirements are the only connection between the defendant and the government agency that is the victim, this connection is insufficient to show a fiduciary relationship necessary for a § 3B1.3 adjustment." *United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008). While this sort of fiduciary relationship may result from physicians who

either did not provide billed-for treatment or provided medically unnecessary treatment, as in *Hoogenboom* and *Vivit,* Gillman's position as a co-administrator of Passages is insufficient. *See Id.*; *see also Garrison*, 133 F.3d at 841-42 (court found that a CEO of a home health provider did not occupy a position of trust vis-à-vis Medicare); *United States v. Anderson*, 85 F.Supp.2d 1084, 1099 (D. Kan. 1999) (finding that abuse of trust enhancement did not apply to CEO of a hospital); *United States v. Hayes*, 574 F.3d 460, 479 (8th Cir. 2009) (abuse of trust enhancement did not apply to supervisor of a Medicaid-funded home health care agency). As such, the existence of a mere contractual or arm's length relationship between Gillman and Medicare is not enough for the enhancement to be appropriately applied against him.[2]

What is more, the only victim in this case is Medicare because Passages, as a Medicare-funded provider, billed for medically unnecessary hospice care. A Medicare-funded care provider, however, as "a matter of law, does not occupy a position of trust vis-à-vis Medicare." *United States v. Mills*, 138 F.3d 928, 941 (11th Cir. 1998); *citing Garrison*, 133 F.3d at 844-46. Specifically, *Garrison* requires courts to hold that "the United States is, as a matter of law, the only possible victim of a Medicare-fraud crime" and that a defendant's position of trust within his organization is "irrelevant." *Garrison*, 133 F.3d at 848 (noting that defendant was CEO of a health care provider). Gillman's sentence should, therefore, not be enhanced because of any breach of public trust due to placing his signature on

[2] *See United States v. Novak, et al.*, 13 CR 312 (the district court determined that the abuse of trust and discretion enhancement was inapplicable to the administrators of Sacred Heart Hospital).

Medicare certification forms.

Second, the fact that Gillman was an attorney, and represented himself as such to his employees, is of no consequence. A breach of trust enhancement under § 3B1.3 is not appropriate "unless *the victim* of the breach itself conferred the trust." *Mills*, 138 F.3d at 941 (emphasis provided). It would therefore necessitate that Gillman must have represented himself as an attorney to the victims of the charged scheme and that his position as an attorney contributed to his ability to commission or conceal the alleged offense. *See* U.S.S.G. § 3B1.3 cmt. n. 1. Aside from the issue of whether Gillman's representation that he was attorney when dealing with his employees had *any* effect on the commission of the charged scheme, the facts are clear: the employees are *not victims* of this offense and their trust in Gillman – should any have existed – is irrelevant. Furthermore, as it relates to Medicare, there is absolutely no evidence presented by the Government that Gillman ever represented himself as an attorney, or, that even if he had, whether that would have had any impact on the trust conferred to him by a federal health care program, namely, Medicare.

## II. LEGAL STANDARDS

This Court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to just the crime. *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011); *United Sates v. Ramirez-Mendoza*, 683 F.3d 771, 777 (7th Cir. 2012). Because sentencing guideline ranges are not to be presumed reasonable, this Court must consider whether they actually conform to the circumstances of the

case. *Nelson v. United States*, 555 U.S. 350 (*per curiam*); *United States v. Dean*, 414 F.3d 725, 730-31 (7th Cir. 2005). In doing so, this Court should consider the respective parties' arguments as to whether the guidelines range should apply, but "without any thumb on the scale favoring a guidelines sentence." *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007); *see Sparks v. United States*, 555 U.S. 261, 264-65 (2009) (a district court may sentence a defendant below the guidelines range based on a disagreement with a particular guideline even in an ordinary case). So long as the selected sentence is "rooted in § 3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency[,]" a below guidelines sentence is appropriate. *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

After calculating the applicable Guidelines range, district courts are then tasked with imposing a sentence that is reasonable under U.S.S.G. § 3553(a). Section 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the four statutory purposes set forth under § 3553(a)(2)[3]. Prior to this consideration, however, the courts shall first consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). The Supreme Court has held that, in determining

[3] The four statutory purposes of sentencing are the need for the sentence to: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment [Retribution]; (2) afford adequate deterrence [general deterrence]; (3) protect the public from further crimes by the defendant [specific deterrence]; and (4) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner [rehabilitation]. 18 U.S.C. § 3553(a)(2).

an appropriate sentence, "[n]o limitation…[is]…to be placed on the information concerning the background, character, and conduct" of a defendant. *Pepper*, 131 S.Ct. at 1241. It is the sentencing court's decision what weight to place on any of these individual factors. *See United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006) ("The statute does not weigh the factors. That is left to the sentencing judge, within the bounds of reason, which are wide."). In *Pepper v. United States*, the Court reiterated that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 1239-41, *quoting Koon v. United States*, 518 U.S. 81, 113 (1996).

## III. SENTENCING CONSIDERATIONS PURSUANT TO 18 U.S.C. § 3553(a) JUSTIFYING A BELOW-GUIDELINES SENTENCE

A sentencing court's inquiry begins by calculating the defendant's advisory guideline range. *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008). Any guideline range that this Court ultimately uses for Gillman will only be advisory and should not be mechanically followed because it fails to adequately take into account the unique circumstances of this case, Gillman's lack of any prior criminal convictions, his indispensable role as a caretaker to his family and his community, and the extremely low risk of recidivism.

The advisory guideline range is far greater than necessary to promote the goals of sentencing in this case. "While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors

that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011).

Bearing in mind the objections to the PSR as described above, Gillman calculates his advisory Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(2)): | 6 |
| Loss Calculation of More than $3,500,000 but Less Than $9,500,000 (§ 2B1.1(b)(1)(J)): | +18 |
| Adjustment for Role in the Offense (§ 3B1.1(a)): | +4 |
| Obstruction of Justice (§ 3C1.1): | +2 |
| Acceptance of Responsibility (§3E1.1) | -3 |
| Total | 27 |

Coupling the resulting anticipated offense level of 27 with a criminal history category of I, Gillman's advisory sentencing range is 70 to 87 months imprisonment.

Gillman respectfully asks this Court to, in its discretion, depart from this advisory guideline range, and to sentence him to the shortest term of imprisonment permissible under the law. The Probation Department has recommended that a sentence to no more than 36 months imprisonment would be a sufficient sentence in this case. Seth does not mean to suggest that this is an appropriate sentence, but acknowledges that it is a sentence recommended by a neutral third party that properly takes into account the offense of conviction and, when weighing the 3553(a) factors, was considered to accurately reflect Seth's culpability and sufficiently meet

the purposes of sentencing.

As such, in fashioning a sentence in accordance with the § 3553(a) factors and *Gall*, Gillman respectfully asks this Court to consider his personal history and characteristics, acceptance of responsibility, ruined reputation, and the collateral consequences he faces as a result of his lapses in judgment.

### A. The Nature and Circumstances of the Offense

Gillman does not attempt to diminish the seriousness of the offense of conviction, however, the applicable guideline range grossly overstates the nature and circumstances of this crime. While Gillman – through Passages – unjustly lined his pockets by submitting false claims, the patients admitted to Passages and placed in General Inpatient Care ("GIP") received far more specialized attention and care than they were getting in their respective nursing homes. There are arguably thousands of lawsuits against nursing homes across this country alleging neglect, abuse, improper care, and sub-standard conditions. Many of Passages' patients were nursing home residents that had spent their entire adult lives paying a portion of their salaries into Medicare with the expectation that they could rely on the health care program to care for them in their final years. Unfortunately, the care certain nursing home providers devoted to these patients could hardly be considered a program "benefit". Whether or not its nursing home patients were appropriately qualified for hospice or GIP care, the end result was the same, Passages provided hundreds of elderly patients the extra care and assistance that the nursing homes neglected to provide.

Seth Gillman's underlying intentions for opening a hospice facility were good and had a humanitarian purpose. After witnessing his grandmother's hospice experience, Gillman was motivated to ensure that others received the same individualized care in their last weeks, months, or years. His mantra, and that of Passages, was: "No one dies alone."

Contrary to many Medicare fraud cases, evil malice or inherent disregard toward the sick and elderly is entirely absent from this case. Passages patients who were improperly placed on GIP received an abundance of individualized, exceptional palliative care. The level of compassion, sensitivity, family counseling, pain management, and pastoral care, Passages provided its patients were considered exceptional. *See* Shael Bellows, Letter #19. That Gillman made money off claims that were submitted for GIP care provided to patients, 50% of which did not qualify to receive it, is precisely why he pled guilty and accepted responsibility for his actions. Despite his illegal conduct, the fact that hundreds of elderly patients received far better care than they qualified for should not be overlooked. The true nature of this specific offense is that Gillman improperly profited off the Passages patients who received extensive end of life care that, under Medicare guidelines, they were not qualified to receive.

## B. <u>Seth Gillman's Personal History and Characteristics</u>

Seth Gillman was born in New York to Michael and Darryle Gillman. As the only boy amongst his three sisters, Seth struggled under the immense pressure and

expectation to support and look after his sisters, and eventually, his parents[4]. While in New York, Seth and his sisters were primarily raised by his grandmother so that his parents could support the financial needs of a large family. Shortly before he reached the age of 18 years old, Seth's parents placed him in a boarding school in New York, while they and his three sisters relocated to Chicago so that his father could pursue a business opportunity. PSR, ¶95. Although Seth felt abandoned by his family, he took this opportunity to take care of his grandmother who, shortly following the death of her husband, had isolated herself in her large, yet very empty home.

Following boarding school, Seth volunteered to remain in New York where he attended Queens College so that he could continue to care for and look after his grandmother, who lived in close proximity to the campus. *See* Darryle Gillman, Letter #2. The two met for dinner every night and Seth accompanied her to the Synagogue every Saturday. *See* Michael Gillman, Letter #3. This continued as Seth attended Yeshiva University's Benjamin Cardoza School of Law, where he graduated with a *Juris Doctorate* in 1993. It was during this time that Seth met and married his now former wife, Sharon Gillman. Together they have two children, Zeke (20) and Isabelle (17). In his continued need to impress and gain the respect of his father, Seth and his new wife moved to Chicago so that he could attend DePaul University's School of Law, where he received a Master's of Law (LLM) degree in Health Law in 1995.

---

[4] *See* David Turner, Letter #8 ("As the only boy, Seth felt strongly about upholding is 'son' responsibilities. He internalized that sense of responsibility. He put his parents needs before his own on all occasions.")

A few years later, while visiting the family in Chicago, Seth's grandmother fell extremely ill and, upon being discharged from the hospital, was ordered to enter a rehabilitative nursing home. Seth visited her in the nursing home every day. Eventually, the time came when she decided she no longer wished to have her life prolonged through medical intervention.

Seth spearheaded the effort to find the right hospice program and was crucial in ensuring that his grandmother received the best end of life care from hospice personnel. His grandmother remained on Hospice for over two years before she passed away. Although he now realizes that some of the palliative care she received may have been unsupported, he and his family will forever be grateful that she received it and was not left to die alone. It was through this experience that Seth became inspired to open Passages, the mantra of which became "No One Dies Alone[5]."

Seth began his career under the supervision of his father, who was operating multiple nursing homes around Illinois. Looking for approval, Seth proposed to his father the notion of starting a hospice. At his father's suggestion, Seth added his father and two brothers in law as ¼ shareholders in the business. Passages Hospice was approved for Medicare certification in 2005. Seth ensured that his employees understood the life of a nursing home patient entering hospice: they feel alone, forsaken, ignored, as if they have lost all aspects of their privacy, and are yearning

[5] "Seth explained that his motivation came from seeing his grandmother need hospice care. He was troubled that so many needed that kind of care, but in the nursing home business, he saw so many people who didn't and were neglected in their final days and months." *See* David Turner, Letter #8.

for more nursing care than a nursing home can commonly spare. Seth was known for visiting every Passages facility on a daily basis to check up on his staff, visit with the patients on Hospice, and talk with the patients' families. *See* Shannan Marie Bybee, Letter #1. Unfortunately, Seth was not business savvy and struggled to keep the business running.

In 2008, he was introduced to Gwen Hilsabeck, who he hired to market and grow the company. Following this decision, Passages began utilizing GIP care, the business grew, and Seth quickly found himself in over his head.[6] With the overwhelming pressure and stress that followed, Seth began consuming alcohol and ingesting cocaine on a daily basis. PSR, ¶¶122, 126. Ultimately, Seth let his desire to expand his business and support his father[7], sisters, and family overcome his capability to make good, and lawful choices. With a heavy heart, unyielding shame, and extreme remorse, Seth takes full responsibility for the transgressions that bring him before this Court for sentencing.

The conduct that led to Gillman's conviction does not accurately reflect the man facing sentencing. As Judge Rakoff so eloquently stated, "Surely, if ever a man is to receive credit for the good he has done, and his misconduct assessed in relation to his life overall, it should be at this moment of sentencing, when his future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006).

[6] As his father so artfully explains, Seth "sees the forest but misses some significant trees. He tends to leave details to others while he explores the bigger picture." *See* Michael Gillman, Letter #3.

[7] *See* David Turner, Letter #8 (Seth felt he needed to be in Chicago to help his parents build their business and support the rest of the family).

Emphasizing the prescription that the Court shall consider Seth as an individual and that every case is a unique study in human failings, he humbly asks this Court to consider the man behind the conduct for which he now stands convicted.

**1. The Man Revealed in the Letters**

In weighing the good against the bad, there is much good to admire in Seth Gillman. Numerous letters of support were submitted by family, friends, and colleagues, and offer the most reliable resource in gauging Gillman's history and characteristics[8]. The overwhelming outpour of honest and heartfelt love, support and admiration for Seth speaks volumes to his character. The consistent theme illustrated throughout the letters is that of an altruistic man who has devoted his life to helping others, whether or not they were family members, friends, or complete strangers. *See* Maurice Terzi, Letter #11.

Seth was a pillar in his community, known and loved for his selfless aspirations to help those around him. Whether Seth was struggling financially or improperly profiting from his illegal conduct, he was always ready and willing to do all he could to support those in need. *See* Maurice Terzi, Letter #11.

Seth's parents and siblings consider him to be an instrumental part of their lives - the glue that holds the family together - the one who takes care of everyone else. *See* Ariel Glaubach, Letter #4. The letters describe how Seth has acted as a parental role model and father figure to his sister's seven children, and a loyal and devoted father to his own children. *See* Ashley Gluck, Letter #21; David Turner,

[8] In order to protect the privacy of the authors, the character letters have been separately submitted to the Court. AUSA Stephen Lee and Probation Officer Zakary Freeze have been provided copies of the same.

Letter #8.

As a man who was influenced to start Passages based upon his own life experiences with Hospice, Seth has had a powerful impact on helping others realize their own life ambitions. He pushed people to do their best, take chances, and "show them what you're made of." *See* Tamar Gillman Meiselman, Letter #5. Seth is praised as one who strives to instill confidence in those who feel defeated by encouraging them to succeed. *See* David Meiselman, Letter #7.; Aliza Frank, Letter #6. Seth continued to support and encourage others even as he faced criminal charges. *See* Shannon Bybee, Letter #1 (Seth took the time to write reference letters for Passages employees who were struggling to find work after Passages shut down in 2014).

The authors of these letters are people who have had the opportunity and the pleasure to personally observe and come to know Seth, inside and out. They know and understand him best. Their words provide an honest and deep prospective of Seth's history and characteristics. Each letter represents a unique individual that has taken the time to express their personal experiences with and sentiments for Seth Gillman. Understanding that he has committed a crime, his friends, family and colleagues ask this Court to afford leniency in sentencing, and to impose a sentence that would offer him a second chance.

**2. Charitable Contributions**

The letters submitted on his behalf describe a charitable man worthy of this Court exercising its discretion in granting a variance in sentencing. Courts are

permitted to consider a defendant's charitable contributions, public services, and similar good works in evaluating a downward variance from a guidelines sentence. *United States v. H. Ty Warner*, 13-CR-731 (N.D. Ill. Jan. 14, 2014); see *United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) (court affirmed district court's 3-month sentence rather than 60-month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, Thurston's charitable work, community service, and generosity with the time he provide others).

Seth has a demonstrated commitment to his community, charitable endeavors, and those otherwise in need of help. His commitment is greater than that of the ordinary individual because many of his charitable acts were done without the intent of receiving credit. Through family members, friends, and colleagues it was stated many times that there is no one in this world Seth would not lend a helping hand. *See* Kenneth Rubinstein, Letter #12 (talks of having personal knowledge of the very generous contributions Seth made to charitable and educational organizations and various religious institutes).

As a child of a strictly orthodox Jewish household, Seth's religion and desire to give back to the members of the orthodox community was paramount. For much of his adult life, Seth made significant donations to his children's schools and his synagogue, both financially and with his time. *See* Maurice Terzi, Letter #11. "Seth was the one to count on for charity. When an organization needed a hand or financial support, he never said no and would do so quietly and anonymously." *See* Aliza Frank, Letter #6. This giving nature is further exemplified in Rabbi Leibtag's

eloquent recollection of Seth swiftly coming to the aid of an elderly, widowed woman who had unexpectedly lost one of her developmentally challenged daughters. *See* Rabbi Leibtag, Letter #20.

In sum total, though doing good works for others doesn't relieve a citizen of the obligation to comply with the law, the good and noble and decent acts memorialized here mark Seth's character as one of compassion and decency. The need for punishment is considerably tempered by the character of the human being that now faces sentencing.

**3. Gillman's History of Substance Abuse Necessitates Further Treatment**

Gillman has a long history of using and abusing multiple substances, including: cocaine, alcohol, and anti-anxiety medications. The stress inherent in a federal investigation, and ultimate criminal charges, only exacerbated his serious substance abuse problem. From 2008 to 2014, Gillman sought treatment for his substance abuse and mental health issues; regrettably, he continued to relapse into old habits. PSR, ¶115.

As he accepted responsibility for his criminal conduct, he too has accepted that he suffers from many addictions. Subsequent to his change of plea, Gillman acknowledged the nature of his serious substance abuse problem to both his probation officer and his pre-trial services officer. PSR, ¶¶122-130. As a result, he agreed to participate in mental health/substance abuse testing and treatment as directed by his Pretrial Services Officer. For the last ten months, Gillman has attended weekly therapy sessions with clinical psychologist, Sarah Sanders. PSR,

¶119.

In his willingness and desire to seek professional help, Gillman has found the clarity and honesty that he lost years ago. This sort of motivation for rehabilitation is directly relevant to the sentencing consideration in this case. *See United States v. Robertson*, 662 F.3d 871, 877-78 (7th Cir. 2011) (demonstrated motivated rehabilitation is direct and relevant evidence at sentencing.) It is requested that the Court make a recommendation to the Federal Bureau of Prisons that Gillman participate in the RDAP treatment programs to further the progress he has already made.

### C. Just Punishment

It is axiomatic that "just punishment" under 18 U.S.C. § 3553(a) encompasses not just sentence, but also other punishment sustained by Defendant. Beyond the sentence imposed by this Court, there are a number of additional punishments Seth has and will continue to sustain as a result of his conviction.

The felony criminal conviction, in and of itself, will continue to haunt him for the rest of his life. But the penalties do not end there. Federal agents swarmed Passages' headquarters in January 2012. Over the last five years of his life, not a day goes by where Seth has not felt the destructive effects of this case. Shortly following his indictment, Seth was persuaded to give up his rights to the company he had started. Medicare withheld millions of dollars in payments for legitimate claims filed subsequent to the end of the charged scheme and ultimately revoked Passages' Medicare license. The business Seth had built with the best intentions in

mind crumbled shortly thereafter and was forced to declare bankruptcy.

The significant financial penalties associated with his conviction will likely mean that, subsequent to serving whatever sentence this Court deems appropriate, Seth will never experience again benefit from a financially stable business or lifestyle. In addition to a $9,000,000 restitution penalty, Seth voluntarily agreed to the immediate entry of a preliminary order of forfeiture and a personal money judgment, and has consented to a civil settlement agreement with the Department of Justice for twice the restitution amount. As his ability to maintain gainful employment to repay the remaining balance of these financial penalties has already been severely encumbered, the punishments associated with his conviction will continue long after his sentence is complete. Seth will face mandatory exclusion from billing Medicare and can never again pursue a career in the health care industry. 42 U.S.C. § 1320a-7. In 2015, the Illinois Department of Professional Regulations revoked Seth's Nursing Home Administrator License. Similarly, Seth will not be able to establish any sort of career as a practicing attorney. On September 23, 2016, Seth was disbarred by the Illinois Supreme Court and his license to practice law was permanently suspended. Essentially, the five years of his life that involved the instant criminal offense has resulted in emotional, psychological, financial, and professional punishments that he will experience for the rest of his life.

Additionally, Seth has suffered substantial punishment through the loss of his reputation and personal relationships. For the first time in his adult life he has

been unemployed and his pristine reputation as a man and professional has been damaged. The initial allegations and his conviction have been made available to the general public by various media outlets. The Internet age makes that embarrassment relatively permanent, since a simple search of his name will forever reveal his criminal transgressions and his felony conviction. His once envious reputation is now a joke. As this Court has recognized, losing your good name is a significant punishment. *United States v. Hastert*, No. 15 CR 315, April 27, 2016 Transcript ("TR") at p.30.

As news spread of his arrest, Seth was ostracized from the close-knit, orthodox Jewish community he had grown to love and support. The man, who had attended his Synagogue every week for the last 17 years and made countless contributions to it and its' members, is now shunned by the entire community. *See* Kenneth Rubinstein, Letter #12. Because of this, he can no longer attend religious services or interact with those he had grown to depend on and needs now more than ever. Over the last five years, Seth has watched as his so called "friends" turn away from him in public and avoid any association with him or his family. *See* Maurice Terzi, Letter #11.

The stain that follows from a very public criminal indictment spread from Seth onto his entire family. Subsequent to the criminal charges and the negative publicity resulting from it, Seth's wife of almost 20 years kicked him out of their family home and eventually filed for divorce. *See* Shannon Bybee, Letter #1. Seth's teenage children also suffered the devastating consequences that frequently plague

defendant's families. With a broken heart, Seth has listened to his children describe instances where they were subjected to ridicule and embarrassment at the hands of their high school classmates. Seth's children now resent him and have yet to forgive him for the shame he brought upon their family. The continued effects of the loss of his wife, the love of his children, his home, his reputation, and his business have been unbearable.

**D. Deterrence**

In this case, there is no need for the sentence to afford general deterrence. The purpose of general deterrence is to discourage those similarly situated to Seth Gillman from engaging in the same sort of misconduct. Assessing the interests of the unknown can and have quickly led to disproportionate and unjust punishment of an individual facing sentencing.

General deterrence in this case comes from the stern penalties associated with the felony conviction. Individuals associated with health care facilities are unlikely to engage in this type of behavior because they do not want to risk losing their livelihoods to steep financial penalties, the inherent loss of any professional licenses, and the permanent exclusion from the health care industry.

As it relates to specific deterrence, there is undoubtedly no legitimate concern that Seth would ever return to criminal conduct. In imposing a sentence sufficient to meet the need to protect the public from any future crimes of the defendant, this Court should consider the extremely low risk of recidivism presented by Gillman's unique circumstances. Commission studies show that minimal or no prior

involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism. See, *USSC, A Comparison of the federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor score*, at 15 (2005). Seth has never been subjected to a term of imprisonment and any incarceration will undoubtedly have a severe impact on him, certainly more so than someone previously subject to imprisonment. See *United States v. Baker*, 445 F.3d 987, 990-992 (7th Cir. 2006) (upholding downward variance based on the fact that "a prison term would mean more to Mr. Baker [a defendant who had never been incarcerated before] than to a defendant who previously had been imprisoned"). It is obvious that the crime that Gillman is to be sentenced for was an aberration and that he will never commit another crime.

Moreover, the goal of specific deterrence has been already accomplished as evidenced by his acceptance of responsibility, his performance on pre-trial release, and the five years of his life that have already been consumed with humiliation, shame, loss, and anguish. Seth has suffered substantial punishment through self-reflection and accepting responsibility for the stress, shame and dishonor his actions have had on his loved ones. Those close to him have similarly recognized that he has discussed and exhibited sincere remorse and regret for his actions. *See* Shuly Roth, Letter #10 (Seth is extremely remorseful and striving to regain balance and emotionally compensate those he has disappointed); Alon Stein, Letter #13 ("It is clear that Seth's interest in Kabalah is a symptom of his overwhelming remorse and regret"); Richard Katz, Letter #15 ("Seth has become more introspective,

reflecting on his life's choices and the impact they have had on those close to him … I have found him to be remorseful" … he has repented); Rabbi Leibtag, Letter #20 (As I sat with Seth over the past few years since his arrest, I have seen a man that realizes his mistakes and recognizes his errors); David Turner, Letter #8 (since this ordeal began, "Seth has become a beaten man, he has suffered greatly in the public eye, in his family relationships, in his finances, and in his spirit").

In light of Seth's background, lack of criminal history, stable employment history, high education level, and other punishments he has already sustained, this Court can confidently conclude that he will lead a law-abiding life from this point forward.

**E. Additional 3553(a) Considerations**

In the wake of Booker, "departures aside, the nature and degree of [a defendant's] assistance to the government is of course a relevant sentencing factor." *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006). A defendant can be given credit for Government cooperation pursuant to § 3553(a), even where he is not eligible for a Government motioned 5k1 departure:

> In the wake of Booker, we have concluded that discussion of a district court's departure decisions has been rendered 'obsolete.' Instead, "[t]he district court's obligation in every instance is to consult the Guidelines and, taking into account the sentencing factors set forth in section 3553(a), to impose a reasonable sentence." The proper question is whether the sentence is reasonable in light of all relevant sentencing factors, one of which is the nature and degree of [the defendant's] assistance.

*United States v. Sisco*, 176 F. App'x 692, 693 (7th Cir. 2006) (internal citations omitted).

In the instant case, Seth has displayed his willingness to cooperate and further accept responsibility for his actions. Subsequent to his guilty plea, in an effort to assist the Government with any future investigations, on two separate occasions Seth agreed to personally meet with federal agents and United States Attorneys. Understanding that his cooperation may not result in any benefit to himself in sentencing, Seth not only admitted his conduct in the instant offense, but also divulged any and all information he had relative to fraudulent conduct in the health care industry. Moreover, in his continued efforts to assist the Government, Seth referred an unrelated third party to meet with the Government to discuss his or her knowledge of potential criminal activity in the health care industry.[9] Ultimately, the Government determined that his cooperation, while informative, was not substantial enough to suggest a 5K1 departure.

Seth's acceptance of responsibility and cooperation is further exemplified by his willingness to work with Department of Justice to resolve and settle any outstanding financial issues prior to sentencing, including his agreement to enter a civil settlement with the Department of Justice for twice the restitution amount calculated in the instant case[10].

---

[9] Due to the fact that this individual did not have first hand knowledge of criminal activity in the health care industry, the Government considered his or her proffer more of a tip and therefore determined she would not be useful in any future investigations.

[10] A draft settlement agreement for the civil claims against Seth Gillman is in the process of being finalized by the Department of Justice, the State of Illinois, and the Relators. A finalized and executed version of the settlement agreement will be tendered to the Court and the parties upon execution.

## IV. OBJECTIONS TO CONDITIONS OF SUPERVISED RELEASE AS PROPOSED IN THE PRESENTENCE INVESTIGATION REPORT

Should this Honorable Court decide that a term of supervised release is warranted, Gillman respectfully objects to Discretionary Conditions (14) which restricts Gillman's travel to the jurisdiction within which he is being supervised and Discretionary Condition (16) which permits a probation officer to visit Gillman at any reasonable time without notice, as recommended by the Probation office. Gillman offers the following alternatives to the above-referenced Conditions:

> (14) "remain within the jurisdiction of the continental United States, unless granted permission to leave by the court or a probation officer"; and,
>
> (16) "permit a probation officer to visit the defendant at any reasonable time with 3-days' advance notice to Defendant."

It should be noted that counsel for Gillman has not had the opportunity to confer with the Government, and therefore, does not know their position as to such modifications.

## CONCLUSION

Seth Gillman is a kind-hearted and generous man who has dedicated his life to helping those around him. He has immense potential to return to life as a productive citizen following any imprisonment this Court may impose. Gillman respectfully asks this Court to consider his personal history and characteristics, acceptance of responsibility, voluntary drug and mental health treatment, ruined reputation, and the collateral consequences he faces as a result of his conviction, in fashioning the shortest sentence permissible under the law that satisfies the goals of sentencing and is consistent with the requirements of 18 U.S.C. 3553(a).

Respectfully submitted,

*/s Blaire C. Dalton*
*An Attorney For The Defendant*

Blaire C. Dalton
DALTON LAW, LLC
53 W. Jackson Blvd., Suite 1420
Chicago, IL 60604
(847) 373-4750

Edward M. Genson
Vadim A. Glozman
EDWARD M. GENSON & ASSOCIATES
53 W. Jackson Blvd., Suite 1420
Chicago, IL 60604
(312) 726-9015

## CERTIFICATE OF SERVICE

I, Blaire C. Dalton, an attorney for Defendant Seth Gillman, hereby certify that on this, the 14th day of February, 2017, I filed the above-described document on the CM-ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

Respectfully submitted,

*/s Blaire C. Dalton*

Blaire C. Dalton
DALTON LAW, LLC
53 W. Jackson Blvd., Suite 1420
Chicago, IL 60604
(312) 726-9015